In re WHITACRE SUNBELT, INC., Debtor.

John W. RAGSDALE, JR., as Trustee for the Estate of Whitacre Sunbelt, Inc., Plaintiff,

v.

SOUTH FULTON MACHINE WORKS, INC., and David A. Whitacre, Defendants.

Bankruptcy No. A94–61954–JB.
Adversary No. 95–6615.

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

June 2, 1997.

William Russell Patterson, Jr., Ragsdale, Beals, Hooper & Siegler, Atlanta, GA, for Plaintiff.

F. Carlton King, Jr., King & Croft, L.L.P., Atlanta, GA, for Defendant.

James Hugh Potts, II, Potts & Badaruddin, Richard K. Valldejuli, Atlanta, GA, for Professional Asset Services, Inc.

## *ORDER*

JOYCE BIHARY, Bankruptcy Judge.

This matter is before the Court on an objection by Professional Asset Services, Inc. ("PAS") to a motion by John W. Ragsdale, Jr., as Trustee for the Estate of Whitacre Sunbelt, Inc. ("Whitacre Sunbelt" or "debtor"), to compromise and settle a claim in Adversary Proceeding No. 95–6615, *Ragsdale v. South Fulton Machine Works, Inc., and David A. Whitacre.* To understand the nature of PAS's objection and the responses by the trustee and Defendant South Fulton Machine Works, Inc. ("South Fulton") to the objection, it is necessary to set out in some detail the background and procedural posture of both the main case and this adversary proceeding. This is a core proceeding under 28 U.S.C. § 157(b)(2)(H).

On February 9, 1994, both Whitacre Sunbelt and a related corporation, Whitacre International, Inc. ("Whitacre International"), filed petitions for bankruptcy relief. Whitacre Sunbelt originally filed the case under Chapter 11 of the Bankruptcy Code, but the case was converted to a Chapter 7 case almost immediately, and plaintiff Mr. Ragsdale was appointed the Chapter 7 Trustee. On July 25, 1995, Defendant David A. Whitacre filed a personal bankruptcy under Chapter 7.[1]

---

1. Whitacre International's case is Case No. 94–61953, and Mr. Whitacre's personal bankruptcy is Case No. 95–70143.

On April 21, 1994, the trustee notified the Clerk of the Bankruptcy Court that there would be a distribution in the Whitacre Sunbelt case. Pursuant to this notification, the Clerk notified all creditors and other interested parties that "a distribution appears possible," and that "therefore, all creditors are hereby notified that they have through July 27, 1994, in which to file their proofs of claim if they wish to participate in any dividend which might be paid from the estate." This notice is dated April 28, 1994, and was mailed to PAS at 458 East Cherry Street, Columbus, OH 43215–5306. It is undisputed that PAS did not file a proof of claim in this bankruptcy case.

Mr. Ragsdale filed this adversary proceeding on September 26, 1995, against Defendants South Fulton and David Whitacre, seeking to avoid a $325,000.00 payment as a fraudulent transfer under 11 U.S.C. §§ 544(b) and 548, and O.C.G.A. § 18–2–22, and to recover $325,000.00 from South Fulton under 11 U.S.C. § 550. The parties engaged in extensive discovery, and South Fulton and the trustee filed cross-motions for summary judgment. The Court entered an Order on May 9, 1996,[2] finding that Mr. Whitacre was the initial transferee and not a "conduit," and that South Fulton was not an initial transferee under § 550(a)(1) of the Bankruptcy Code. The Court denied the summary judgment motions due to genuine issues of material fact pertinent to South Fulton's defense under § 550(b)(1).

In the Order denying the cross-motions for summary judgment, the Court found a number of facts existed without substantial controversy, narrowing the issues for trial. The Court found that defendant David A. Whitacre was an insider of both Whitacre Sunbelt and of Whitacre International. Defendant South Fulton was a supplier and trade creditor of Whitacre International, not Whitacre Sunbelt. Whitacre International's debt to South Fulton was personally guarantied by Mr. Whitacre.

In 1992, approximately 75% of South Fulton's business was its business with Whitacre International. As of May 11, 1992, Whitacre International owed South Fulton $303,778.14 in unpaid invoices, and South Fulton had committed an additional $924,487.60 to production work for Whitacre International. Between July and September of 1992, Whitacre International and South Fulton negotiated an agreement regarding payment and delivery terms. Balance sheets and income statements of Whitacre International from 1992 given to South Fulton show that Whitacre International's liabilities exceeded its assets and that it was losing money. Whitacre International and South Fulton signed an agreement on September 10, 1992, at which time Mr. Whitacre signed a personal guaranty of Whitacre International's debt to South Fulton in the amount of $467,887.07, plus amounts that may become due for parts inventory up to $250,000.00.

On March 9, 1993, Whitacre International sent South Fulton a financial statement for 1992, showing that Whitacre International was insolvent and was losing money. By letter dated May 21, 1993, counsel for South Fulton informed Mr. Whitacre and Whitacre International that Whitacre International owed South Fulton $932,425.07, and was in breach of the September 10, 1992 agreement. South Fulton refused to provide any parts or service to Whitacre International until the parties entered into a new agreement providing for, among other things, regular payments and unlimited personal guaranties from Mr. Whitacre and his wife. On July 14, 1993, Whitacre International's counsel wrote South Fulton's counsel with the terms of a new agreement, and he enclosed the payment in issue of $325,000.00.

The basic facts relating to the $325,000.00 transfer are not in dispute. On July 14, 1993, debtor issued a check for $325,000.00, drawn on its account at Bank South, payable to "David A. Whitacre" and signed by Mr. Whitacre. Mr. Whitacre took the check to Bank South the same day and exchanged it for a Bank South official check for $325,-000.00 made payable to South Fulton. Mr. Whitacre was listed as the remitter on the official check, and the official check contained no reference to the debtor. Mr. Whitacre tendered the check to South Fulton on July

---

**2.** This Order is reported at 200 B.R. 422 (Bankr.      N.D.Ga.1996).

14, 1993, and South Fulton accepted the official check on July 15, 1993.

The $325,000.00 payment was made as part of the new agreement among Mr. Whitacre, Whitacre International, and South Fulton. The Trustee asserted that the new agreement was intended to pay South Fulton enough to stop it from cutting off supplies to Whitacre International. South Fulton argued that the agreement and the $325,000.00 payment were intended to release Mr. Whitacre from his personal guaranty to South Fulton. Prior to this payment, Mr. Whitacre had never personally paid a Whitacre International obligation. At the time of this payment, debtor was insolvent, owed no debts to South Fulton, and received no consideration for the transfer.

In the May 9, 1996 Order, the Court concluded that the transfer of $325,000.00 to Defendant David Whitacre was not made for reasonably equivalent value, such that it was voidable under state or federal law. *See* 11 U.S.C. § 548(a)(2); O.C.G.A. § 18–2–22(3). The Court held that Mr. Whitacre was the "initial transferee" under 11 U.S.C. § 550(a)(1) of the transfer from Whitacre Sunbelt. The Court found that South Fulton was the immediate or mediate transferee and thus entitled to assert the good faith taker defense of 11 U.S.C. § 550(b)(1). The Court concluded that there were genuine issues of material fact as to whether South Fulton took the payment from Mr. Whitacre in good faith, without knowledge that the initial transfer from debtor to Mr. Whitacre was fraudulent or that debtor was the source of the funds. As this defense rests primarily on determinations of credibility that could not be determined from the existing record, this final issue was to be set for trial.

On August 29, 1996, PAS filed a motion to intervene in this adversary proceeding, to which the trustee objected. On September 9, 1996, Plaintiff Ragsdale filed an application to compromise and settle the claims against Defendant South Fulton for $20,000.00, to which PAS objected. The Court held a hearing on October 9, 1996, on both the applica-

tion to compromise and settle and on the motion to intervene. After hearing argument of counsel, the Court denied PAS's motion to intervene. *See* Order entered October 17, 1996.

PAS's objections to the trustee's proposed settlement were not altogether clear. In the one-page objection filed October 4, 1996, PAS alleged that it advanced $199,000.00 to the debtor on July 12, 1993, and $299,000.00 on July 14, 1993, to finance the purchase of two used printing presses. PAS argued that rather than purchasing the printing presses, the debtor fraudulently conveyed $325,000.00 of the funds advanced by PAS to Defendant David Whitacre, who in turn paid this amount to Defendant South Fulton. The objection did not set forth any legal ground for denying the trustee's application to settle his claim against South Fulton for $20,000.00.

At the October 9, 1996 hearing, there was no objection to $20,000.00 as being an unreasonable amount to settle the claims against South Fulton. In an Order entered October 24, 1996, the Court found that the trustee had satisfied the four-part test[3] set forth in *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1549 (11th Cir.1990), *cert. den.*, 498 U.S. 959, 111 S.Ct. 387, 112 L.Ed.2d 398 (1990), and that the settlement proposed by the trustee was fair and in the best interest of the estate. However, at the hearing, counsel for PAS argued that the trustee had no claim and that any claim belonged to PAS. PAS argued that the acquisition and use of PAS's money by Defendant David Whitacre constituted "theft by deception," citing O.C.G.A. § 16–8–3(4); that PAS acquired a "lien" when it loaned the money to Whitacre Sunbelt, and that if the property were stolen, then even a *bonafide* purchaser could not take good title to it. PAS further argued that the trustee's claim under § 548 is not property of the estate under 11 U.S.C. § 541, and that it might sue South Fulton in state court. Although the relevance and applicability of these arguments to the trustee's motion to settle with South Fulton were unclear, the Court deter-

---

**3.** The four factors are the probability of success in litigation; the possible difficulties in collection; the complexity, expense, inconvenience, and delay involved in the litigation; and the paramount interest of creditors and proper deference to their reasonable views.

mined that PAS should have an opportunity to present law and facts in support of its objection.

Thus, the Court entered an Order on the matter on October 24, 1996, finding that the amount of the settlement was reasonable. However, the Court gave the parties time to address PAS's objection and its assertion that the claim against South Fulton "belongs" to PAS, not the trustee. The Court set a continued hearing on PAS's objection to the application to compromise and settle for November 18, 1996, at which time PAS was to present evidence and law to support its objection. At the request of the parties, this hearing was continued to December 11, 1996.

At the hearing on December 11, 1996, PAS called Mr. Randall M. Dana, a former officer, to testify on its behalf Mr. Dana testified that PAS was engaged in the factoring business, and Whitacre Sunbelt was engaged in the used printing press business. Whitacre Sunbelt frequently did not have the funds necessary to purchase the used presses. Mr. Whitacre would find a buyer for the used press, and come to PAS to obtain the funds necessary to purchase the press. In exchange for the funds, PAS in turn acquired ownership of the purchase order for the used press. Profit from the eventual sale of the press was to be divided evenly between PAS and Whitacre Sunbelt.

Mr. Dana testified that in July of 1993, Mr. Whitacre told PAS that he wanted to buy two used printing presses, one from Fleet Finance, the other from High Hopes Graphics, and that he had located specific buyers for the two presses. PAS agreed to lend Whitacre Sunbelt $300,000.00 and $200,000.00 for the two presses, respectively. PAS subtracted from each of these principal amounts a commission of $1,000.00 that it paid to the finder that had brought the Whitacre companies to PAS. On July 12, 1993, PAS wired $199,000.00 to Whitacre Sunbelt's general operating account at Bank South, and on July 14, 1993, PAS wired an additional $299,00.00 to the same account. PAS advanced these funds so that Whitacre Sunbelt could purchase two specific used printing presses. Mr. Dana testified that PAS and the debtor did not establish any separate bank account for the transactions between PAS and Whitacre Sunbelt.

As previously stated, the facts in the adversary proceeding establish that on July 14, 1993, Whitacre Sunbelt drew a check for $325,000.00 on its Bank South account, payable to Defendant David Whitacre. On the same day, Mr. Whitacre exchanged this check for a Bank South check payable to Defendant South Fulton. Defendant David Whitacre tendered this check for $325,000.00 to South Fulton on July 15, 1993. South Fulton gave good and valuable consideration to David Whitacre in exchange for the $325,000.00 payment.

On July 14, 1993, Whitacre Sunbelt wrote three checks, totaling $497,548.53. In addition to the $325,000.00 check to David Whitacre, Whitacre Sunbelt wrote a check for payroll in the amount of $22,548.53, and a check to Whitacre International for $150,000.00. The sum of the checks written on that day is only $451.47 less than the $498,000.00 PAS wired to Whitacre Sunbelt on July 12 and 14, 1993. On July 14, 1993, Whitacre Sunbelt was insolvent.

PAS asserts that Whitacre Sunbelt had a negative balance in its Bank South account before the wire transfers from PAS, relying on pages from a cash disbursements journal for Whitacre Sunbelt for the period ending July 30, 1993. The Trustee disagrees, and the actual balance in the account at the moment of the transfers is not clear. The parties have not introduced Whitacre Sunbelt's bank statements for the relevant period.

At the hearing on December 11, 1996, counsel for PAS filed proposed findings of fact and conclusions of law. Counsel for the trustee and South Fulton requested time to brief and respond to these papers, and the Court gave them thirty days to do so. On January 10, 1997, the parties requested extensions of time to file briefs, as the parties were engaged in settlement discussions. The Court granted the requests, but the parties were unable to resolve the matter and the Trustee, South Fulton, and PAS have now each filed briefs. After carefully reviewing the evidence presented and the briefs, the Court concludes that the trustee's motion to

compromise and settle the claim in this adversary proceeding with South Fulton should be approved.

■ PAS's objections fall into three general categories. First, PAS argues that the claim asserted by the trustee against South Fulton "belongs" to PAS, not to the trustee. This argument is without merit. The power to avoid under state or federal law potentially preferential or fraudulent transfers made by a debtor belongs to the trustee, not to creditors or to third parties. *See In re Xonics Photochemical, Inc.*, 841 F.2d 198, 202 (7th Cir.1988); *American Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1275 (5th Cir.1983). In the same vein, PAS argues that the $325,000.00 transferred from the debtor Whitacre Sunbelt to David Whitacre and then to South Fulton was never property of the debtor, and thus the trustee's claim against South Fulton cannot succeed. While this argument, if supported by the facts, could be a defense belonging to South Fulton, South Fulton has not raised this defense and has agreed to settle the fraudulent conveyance claim litigation for $20,000.00.

■ PAS's next category of objections is difficult to understand. PAS refers to O.C.G.A. §§ 16–8–3 and 51–10–6 as a basis for objecting to the trustee's settlement of a claim brought under § 548 of the Bankruptcy Code. Section 51–10–6 describes a tort that arises against one who has committed a theft referenced in the criminal statutes under Title 16, Chapter 8, Article I. Section 16–8–3, entitled "theft by deception," makes it a crime to obtain property by any deceitful means with the intention of depriving the owner of the property. However, PAS has not filed or established any cause of action against South Fulton under § 51–10–6. Initially, it appeared that PAS's real objection was a concern that the trustee's settlement would preclude PAS from filing a claim against South Fulton in state court. However, PAS has had more than ample time to assert any such claim in state court and has not done so. Counsel's suggestion at the October 9, 1996 hearing that PAS had not sued South Fulton in state court, because PAS did not have relief from the automatic stay, was not logical, since the automatic stay found in § 362(a) of the Bankruptcy Code does not stay actions against a non-debtor such as South Fulton.

■ PAS cites a number of cases for the proposition that a sale of stolen goods, even to a *bonafide* purchaser, does not divest title. Neither this legal proposition nor the cases cited are applicable here. *Buchanan v. Adams*, 173 Ga.App. 603, 327 S.E.2d 775 (1985), involved stolen silverware. *First National Bank of Cobb County v. National Dealer Svcs., Inc.*, 155 Ga.App. 384, 270 S.E.2d 911 (1980), *General Fire & Casualty Co. v. Kuffrey*, 115 Ga.App. 121, 153 S.E.2d 590 (1967), and *Arnold v. Conner*, 100 Ga. App. 503, 111 S.E.2d 638 (1959) involved disputes over stolen automobiles. Title to money is different than title to goods. Title to money passes automatically with delivery. *See United States v. $3,000 in Cash*, 906 F.Supp. 1061, 1066 (E.D.Va.1995) (*citing Land Oberoesterreich v. Gude*, 86 F.2d 621 (2d Cir.), *cert. den.* 300 U.S. 663, 57 S.Ct. 493, 81 L.Ed. 871 (1937)); *DeChristofaro v. Machala*, 685 A.2d 258, 263 (R.I.1996). Public policy favoring freedom of trade underlies this approach: "Possession of money vests the title thereto in the holder; and, under the law merchant, in order to insure ready acceptability of money in the normal channels of trade, title to money passes with delivery to a person who acquires it in good faith and for valuable consideration." 54 Am.Jur.2d *Money* § 6 (1971).

■ Furthermore, a thief can pass good title to stolen money if the transferee takes in good faith and for value. The Restatement (Second) of Torts provides at § 229, comment d: "[N]o legal interest can ordinarily be acquired in a chattel *other than current money* or a negotiable instrument, by dealing with one who has stolen it." (emphasis added). American Jurisprudence 2d notes:

Money and banknotes are exceptions to the general rule that no one can obtain title to stolen property, at least where the person receiving the stolen funds does so in good faith and for a valuable consideration. The general proposition supported

by the great weight of authority is that only bad faith on the part of a third person receiving stolen money, or the failure on his part to pay a valuable consideration therefor, will defeat his title as against the true owner.

54 Am.Jur.2d *Money* § 7 (1971).

Georgia law provides that one wrongfully in possession of money can pass title to one who takes in good faith and for value. *See Tanner v. Lee*, 121 Ga. 524, 526, 49 S.E. 592, 593 (1904); *Hancock v. Empire Cotton Oil Co.*, 17 Ga.App. 170, 179, 86 S.E. 434, 437–38 (1915). Under Georgia law, value in this context includes the satisfaction of an existing debt. *Tanner*, 121 Ga. at 526, 49 S.E. at 593. As Justice Lamar explained in *Tanner*:

> Money not only has no earmarks, but is currency, passing by delivery from hand to hand. It may be accepted in good faith, without any obligation to examine the holder's title, or to inquire the source from which he got it. One can give a better title thereto than he himself has, and one who receives it bona fide for a consideration may retain it as against the true owner. . . . [O]ne who receives money bonafide for a consideration, as in payment of a pre-existing debt, gets title thereto good as against the true owner.

*Id.*

At the hearings, counsel for PAS agreed that PAS would not have any claim against South Fulton, unless it could prove that South Fulton took the money in bad faith, knowing that the funds were obtained by the debtor from PAS through a fraud. PAS presented no evidence to suggest any bad faith or wrongdoing on the part of South Fulton. Furthermore, PAS's witness, Mr. Dana, acknowledged that he was not aware of any facts that would lead him to believe that anyone acting on behalf of South Fulton participated with Mr. Whitacre in any kind of fraud on PAS. Thus, PAS has not established any claim against South Fulton that would be affected by the trustee's settlement, and PAS's objections based on some unasserted claim are overruled.

The third objection raised by PAS is to the effect that it has a constructive trust or equitable lien on the proceeds of the trustee's settlement, i.e., the $20,000.00. A constructive trust "is a remedial device created by a court of equity in order to prevent unjust enrichment." *Lee v. Lee*, 260 Ga. 356, 357, 392 S.E.2d 870, 871 (1990). Constructive trusts are not automatically imposed when one party owes another money; they are equitable in nature, such that they are only available in the absence of an adequate remedy at law. *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1518 (11th Cir.1994), *cert. den.* 513 U.S. 1146, 115 S.Ct. 1092, 130 L.Ed.2d 1061 (1995). O.C.G.A. § 53–12–93(a) defines a "constructive trust" as a trust which is "implied whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of equity." The party asserting the existence of a constructive trust has the burden of proof. *Pettigrew v. Southern Aluminum Finishing Co. (In re Amarlite Architectural Prods., Inc.).*, 178 B.R. 904, 908 (Bankr. N.D.Ga.1995).

A constructive trust may be imposed only where the plaintiff's funds are themselves located or traced into other funds or property. *See* Dan B. Dobbs, THE LAW OF REMEDIES § 5.16 at 425 (1973); *Haley, Chisholm & Morris, Inc. v. Parrish*, 127 B.R. 366, 369–70 (W.D.Va.1991). Funds deposited into a commingled account are not generally treated as trust funds. *United States v. N.B.D. Bank, N.A.*, 922 F.Supp. 1235, 1243 (E.D.Mich.1996). When dealing with bank accounts where misappropriated money is deposited into a commingled account with the wrongdoer's own funds, courts apply a formulation of tracing known as the "lowest intermediate balance rule." *See, e.g., Bethlehem Steel Corp. v. Tidwell*, 66 B.R. 932, 942 (M.D.Ga.1986). Under this rule, when trust funds are commingled with the other finds of the wrongdoer, the beneficiary of the trust may recover to the extent of the lowest balance that the account reached after the commingling. *Id.*

PAS has not demonstrated that there was any positive balance in Whitacre Sunbelt's account at any time after the transfers from PAS. In fact, PAS asserts that Whitacre Sunbelt had a negative balance in the Bank South account (-$1,048,086.72) before the wire transfers from PAS. PAS points to Whitacre Sunbelt's cash disbursements journal for the period from July 1, 1993 to July 30, 1993, which has on line 10 under the column entitled "bank balance" an entry of "<$1,048,086.72$," arguing that the balance indicated by the cash disbursements journal is the same as the actual balance in the account. The Trustee responds that the cash disbursements journal is not indicative of the actual balance in the account, because the cash disbursements journal reflects payment of a check in the amount of $1,153,000.00 to Heller Financial that was never presented. The actual balance in the bank account at the moment of PAS's transfers is not clear, and there is no evidence of a positive balance at the time this case was filed. However, even if PAS is correct, the account had a significant negative balance (-$550,086.72) after PAS transferred $498,000.00 to Whitacre Sunbelt. *See, e.g., Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron),* 206 B.R. 394, 403 (Bankr.E.D.Va. 1997) (If an account has a negative balance when misappropriated funds are deposited into it, that deficit is subtracted from the amount deposited before the Court determines whether the funds are traceable.) Thus, there is no *res* to which the "trust" can attach.

If the Trustee replenished the bank account with $20,000.00 in settlement proceeds, PAS would still not have a superior claim to those funds. "[W]here one has deposited trust funds in his individual bank account, and the mingled fund is at any time depleted, the trust fund is thereby dissipated, and cannot be treated as reappearing in sums subsequently deposited to the credit of the same account." *N.B.D. Bank,* 922 F.Supp. at 1243–44 (footnote omitted) (*citing Schuyler v. Littlefield,* 232 U.S. 707, 34 S.Ct. 466, 58 L.Ed. 806 (1914)); *accord, Kepler v. Woods (In re Larson),* 206 B.R. 945, 947 (Bankr.W.D.Wis.1997). Funds that are subsequently deposited into the account are not presumed to replenish the trust funds. *See N.B.D. Bank,* 922 F.Supp. at 1244; *Larson,* 206 B.R. at 947; Dan B. Dobbs, The Law of Remedies § 5.16 at 425 (1973).

The thrust of PAS's argument is that because the account had a negative balance, there is no doubt that the monies it lent to Whitacre Sunbelt went to Defendant South Fulton. Funds that are subject to a constructive trust may not be recovered from third parties if the funds cannot be traced to the third party or if the third party takes for value and in good faith. *See N.B.D. Bank,* 922 F.Supp. at 1242. The $325,000.00 was commingled with Defendant South Fulton's funds. PAS has not established that the $325,000.00 payment received by Defendant South Fulton in 1993 can be traced to the $20,000.00 that South Fulton is paying in 1997. Furthermore, PAS has not produced any evidence that the $325,000.00 was not received by Defendant South Fulton in good faith or for value.

PAS's claim to an equitable lien is also defeated by PAS's failure to file a proof of claim in this case. The bar date for filing claims has long passed, and PAS, with notice of the pendency of this case and the deadline for filing claims, chose not to assert any claim in this estate. The Court's records reflect that PAS was represented by counsel, since the filing of this case and the related case of Whitacre International in 1994. PAS has not addressed this problem in any of its briefs or arguments.

For all the above reasons, PAS's objections to the proposed settlement of Adversary Proceeding No. 95–6615 are overruled; the trustee's motion to approve and compromise the claims with South Fulton for $20,000.00 is GRANTED; and any claim by PAS that it has a lien on the proceeds of the settlement is DENIED.

IT IS SO ORDERED.